In the Matter of Jack G. **BROOKS, M.D., Debtor.**

**Jack G. BROOKS, M.D., Appellant,**

v.

**INTERFIRST BANK, FORT WORTH, et al., Appellees.**

No. 87–1546.

United States Court of Appeals, Fifth Circuit.

May 10, 1988.

---

Walker C. Friedman, Elizabeth P. Sturdivant, G. Thomas Boswell, Law, Snakard & Gambill, Ft. Worth, Tex., for appellant.

J. Robert Forshey, Susan E. Coleman, Fort Worth, Tex., for First RepublicBank.

Jared D. Giddens, Shannon Self, Oklahoma City, Okl., for Consol. Asset Management Co.

Before RUBIN and POLITZ, Circuit Judges, and WALTER\*, District Judge.

ALVIN B. RUBIN, Circuit Judge:

A medical doctor, practicing as a radiologist, filed for bankruptcy in 1985. During the bankruptcy proceedings, he attempted to exclude from the estate his interest in an Employee Retirement Income Security Act (ERISA) pension plan created by the professional association of which he is a member. The issue is whether his interest in the plan is protected from the claims of the bankrupt doctor's creditors because it is a valid spendthrift trust under Texas law.

We agree with the district court and the bankruptcy court, 60 B.R. 155, that the trust is not a spendthrift trust and the doctor's interest in its assets is therefore property of the debtor's estate.

I.

Jack G. Brooks, a doctor of medicine specializing in diagnostic radiology, practices his profession as one of 32 radiologists who are members of a Texas professional association, Radiology Associates of Fort Worth. Although Dr. Brooks has substantial income from his medical practice, he suffered losses from investments in oil, gas, and racehorses. Consequently, he filed a Chapter 11 proceeding in August, 1985, listing, among other debts, $353,000 due to Interfirst Bank of Fort Worth and $940,000 due to First National Bank and Trust Company of Oklahoma City. The Consolidated Asset Management Company replaced First National Bank and Trust in this litigation when the latter went into receivership and the Federal Deposit Insurance Corporation named Consolidated Asset Management Company as its agent and administrator. Dr. Brooks contends that his vested interest in an ERISA-qualified trust established by Radiology Associates is not an asset of his estate. Interfirst Bank and Consolidated Asset Management Company challenge this position, seeking to reach his interest in the trust.

Equity ownership in Radiology Associates is limited by law to professionals, and the 32 doctors each own one share of its common stock. In addition to the doctors, Radiology Associates employs approximately 90 persons as support personnel. The doctors who are members of Radiology Associates practice at six hospitals in the Fort Worth/Tarrant County area, the doctors at each hospital forming a cluster or group within the Association. Because of the nature of the Association's arrangements with the hospitals, which furnish all of the major equipment the doctors use, the Association has few tangible assets.

\* District Judge for the Western District of Louisiana, sitting by designation.

The doctors serve on a rotating basis on the Board of Directors that governs Radiology Associates. A six-member Executive Committee manages the Association, makes determinations regarding financial matters, and sets the salaries paid to the members. One doctor from each cluster is elected to the Executive Committee, membership being rotated on a periodic basis. Dr. Brooks has been a member of the Executive Committee and a Director.

At the end of the calendar year, the Executive Committee fixes the Association's budget for the next calendar year. The Executive Committee determines the Association's estimated income, its estimated expenses, and the amount left over after paying expenses. It then makes the maximum contribution allowed by the ERISA statute to the profit sharing plan: 15% of a member's compensation, not to exceed $30,-000 a year, in addition to a contribution for the qualified non-medical personnel. The Committee then divides the remaining amount by the number of doctor-associates to arrive at the compensation each will receive during the next calendar year. In some years, the compensation distributed to the doctor-associates has been less than the original estimate, but the Association has contributed to the profit-sharing plan the $30,000 maximum for each doctor every year. The result of this process is that the Association distributes all of its net profit to the doctor-associates annually and has never distributed any dividends.

Aside from contributions to the plan for his benefit, the Association paid Dr. Brooks these amounts for the calendar years 1982 through 1985:

| Year | Amount |
|------|--------|
| 1982 | $224,250 |
| 1983 | 249,197 |
| 1984 | 228,072 |
| 1985 | 242,000 |

Dr. Brooks's vested interest in the plan on December 31, 1984, was $495,139.52. The vested balance as of December 31, 1985, was $645,123.09.

1. 11 U.S.C. § 541(a)(1) (1982).

Interfirst Bank, one of Dr. Brooks's creditors, is trustee for the profit-sharing plan, which is administered by an Advisory Committee composed of five doctor-associates. As is the case with other Association committees, each doctor serves on the Advisory Committee in turn. The plan requires that contributions be used "for the exclusive benefit of the Participants and their beneficiaries," forbidding any reversion to the Association "under any circumstances." The plan permits each participant to direct the trustee to invest contributions for his account in any of a number of mutual investment plans maintained by the trustee. A doctor-participant may also direct that contributions on his behalf go to pay premiums on a life insurance policy, but Dr. Brooks has never chosen this option. If a participant terminates his employment with the Association after he has been employed for three years, he is entitled to receive "the entire amount then standing to his credit" in the account.

The Profit-Sharing Plan may direct the trustee to make a loan to any participant "upon such terms as the Committee deems appropriate in an amount not exceeding a certain percentage of the amount then to the credit of his account." Loans are reserved for "hardship cases": If the participant presents evidence that the loan is "clearly necessary," he may borrow, for example, to pay medical expenses arising out of an accident or illness, to meet his family's educational needs, or to finance home improvements or mortgage retirement.

## II.

Bankruptcy Code § 541 defines property of the bankruptcy estate as including, *inter alia,* "all legal or equitable interests of the debtor in property as of the commencement of the case,"[1] but not property that is subject to "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law."[2]

2. 11 U.S.C. § 541(c)(2) (1982).

In *Matter of Goff*[3] we held that "Congress intended by its reference to 'applicable nonbankruptcy law' to exempt from the estate only those 'spendthrift trusts' traditionally beyond the reach of creditors under state law." We determined that, although ERISA–qualified plans must contain anti-alienation provisions,[4] such provisions do not of their own force shelter pension funds from inclusion in the bankruptcy estate and we set forth some of the tests for determining whether ERISA-plan funds are excluded. Unless the debtor elects to claim the federal exemptions, as the Bankruptcy Code permits,[5] the question is whether the funds in the ERISA plan are protected from creditors under the law of the state that governs the trust,[6] here Texas.

Looking to Texas law in *Goff*, as we must here, we concluded that, if a settlor creates a trust for his own benefit, his creditors may reach the trust despite the settlor's effort to shelter that interest by inserting a spendthrift clause in the trust document.[7] The Texas Property Code provides:

> If the settlor is also a beneficiary of the trust, a provision restraining the voluntary or involuntary transfer of his beneficial interest does not prevent his creditors from satisfying claims from his interest in the trust estate.[8]

The Texas rule is consistent with the general American rule, as set forth in § 156 of the Restatement of Trusts, Second.[9] Holding self-settled Keogh plans not excluded, we referred in *Goff* to the settlors' powers to withdraw the assets of the trust while attempting to insulate those assets from their creditors and the ability of the debtors "immediately after discharge of all debts [to] withdraw such funds for their own benefit."[10]

After our decision in *Goff*, Texas amended its property code, effective September 1, 1987, to exempt the assets of all plans qualified under federal tax law.[11] The statute does not, however, purport to be retroactive, so we look to Texas law as it stood in August, 1985, to determine the character of Dr. Brooks's interest in the ERISA trust.

In essence, Dr. Brooks's argument is simple: he is but one of 32 doctors who are members of the Association; he has only one of 32 votes in electing members of its Board; the Association established the profit-sharing plan before he joined its ranks; he does not determine the amount of the annual contributions to the plan; he is not therefore its settlor; and, if he is not the settlor, the trust created pursuant to the plan is a spendthrift trust, excluded from the assets of his bankruptcy estate and insulated from the claims of his creditors.

The parties cite no Texas case and we have found none addressing the question whether a member of a professional association may shield from his creditors his interest in an ERISA plan established by the association. Dr. Brooks, however, seeks to have us deduce a rule from cases he considers similar. He cites *Hines v. Sands*[12] for the proposition that an employer may establish a valid spendthrift trust for an employee even if the employee is allowed lim-

3. 706 F.2d 574, 582 (5th Cir.1983).

4. 26 U.S.C. § 401(a)(13) (1982); 29 U.S.C. § 1056(d)(1) (1982).

5. 11 U.S.C. § 522(b) (1982).

6. *Goff*, 706 F.2d at 586.

7. *Id.* at 587–88.

8. Tex.Prop. Code Ann. § 112.035(d) (Vernon 1984). *See also Bank of Dallas v. Republic Nat'l Bank of Dallas*, 540 S.W.2d 499 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.).

9. § 156 provides in part:
   (1) Where a person creates for his own benefit a trust with a provision restraining the voluntary or involuntary transfer of his interest, his transferee or creditors can reach his interest.

10. *Goff*, 706 F.2d at 588.

11. Tex.Prop. Code Ann. § 42.0021 (Vernon Supp.1988). *See also* Hall, *Retirement Benefits: Texas Property Code Amendment*, Texas Bar Journal 993 (October 1987).

12. 312 S.W.2d 275 (Tex.Civ.App.—Fort Worth 1958, no writ).

ited access to the trust, for instance through borrowing. The court in *Hines* upheld the spendthrift clause in a trust that contained a provision for borrowing,[13] but emphasized: "The trust instrument shows clearly that the trust money was provided wholly by the employer, that Sands, employee, had no part in creating the fund or in its maintenance."[14] Because Sands neither funded the trust nor owned or controlled the company that established the trust, the trust was in no way self-settled. Dr. Brooks, on the contrary, partially owns and controls the Association acting as settlor in this case, and his earnings partially fund the trust.

In support of his position that an employee's contributions to a trust created by the employer do not disqualify the trust as spendthrift, Dr. Brooks cites *Highlands State Bank v. Gonzales.*[15] *Highlands* involved an "Annuity and Thrift Plan," created by Humble Oil Company for its employees, under which an employee could contribute up to 10% of his earnings and Humble Oil would contribute a proportional amount. An employee might also make withdrawals from the plan according to a prescribed formula. The court allowed the employee's creditors to reach that portion of the fund subject to withdrawals by the employee but shielded, as a spendthrift trust, that portion accessible to the employee only by terminating employment with Humble or by death. If the shielded portion corresponded to the amount contributed by the *company,* a fact left unclear in the opinion, then the case does not support Dr. Brooks's assertion that a trust partially funded by the beneficiary's earnings may still qualify as spendthrift. Even if the shielded portion included some of the em-

ployee's contributions, however, the case is distinguishable on the same ground as *Hines:* The employee in *Highlands* was a wage-earner, presumably with no ownership interest in Humble Oil and certainly without control over the company or the Thrift Plan.

Dr. Brooks's creditors cite cases holding that professionals may not shield part of their earnings by establishing profit-sharing or pension plans through their solo practices, partnerships, or associations. A physician employed by a professional corporation of which he is the sole director and shareholder may not shield his interest in a plan created by the corporation,[16] nor may a doctor protect his interest in a plan established by a medical partnership.[17] A law partner's interest in a profit-sharing plan adopted by a three-partner firm is also self-settled.[18] In each of these cases, however, the particular debtor exercised greater control over both the trust and the entity acting as settlor than does Dr. Brooks. More apposite is a decision by the Bankruptcy Court for the Western District of Kentucky[19] holding that a doctor who was a member of a large professional association and a co-trustee of the plan had self-settled the trust.

While these decisions are instructive, they are not controlling. We look beyond them to the basic concepts of the spendthrift trust. The courts of England first approved a clause prohibiting the alienation of a married woman's interest in a trust her family had created for her benefit in order to protect the property of married women, then disabled by common law from enjoying property, from the depredations of their husbands.[20] When first asked to

**13.** *Id.* at 279.

**14.** *Id.* at 278.

**15.** 340 S.W.2d 828 (Tex.Civ.App.—Waco 1960, no writ).

**16.** *In re Daniel,* 771 F.2d 1352 (9th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *In re Lichstrahl,* 750 F.2d 1488 (11th Cir.1985); *In re Graham,* 726 F.2d 1268 (8th Cir.1984).

**17.** *Lerner v. Williamsburg Savings Bank,* 386 N.Y.S.2d 906, 87 Misc.2d 685 (1976); *see also In re Goldberg,* 59 B.R. 201 (N.D.Okl.1986).

**18.** *In re Ridenour,* 45 B.R. 72, 79 (E.D.Tenn. 1984).

**19.** *In re Slezak,* 63 B.R. 625 (W.D.Ky.1986).

**20.** G. Bogert & G. Bogert, Trusts & Trustees § 221, at 375 (1979).

consider the validity of a restriction on the alienability of the interest of beneficiaries other than married women, the English courts declared the restraint void.[21] The restraint on married women's separate estates was special, not to be allowed in trusts generally.

American courts looked more favorably on spendthrift clauses. Stressing the powers of the settlor over his own property, courts thought it important to carry out his directions [22] as well as to protect the beneficiary from his own improvidence or incapacity.[23] In many states, statutes expressly authorize the creation of spendthrift trusts,[24] although in some only a part of the trust assets or income is shielded from creditors' claims.[25]

Following this pattern, the Texas Property Code authorizes spendthrift trusts and sets forth the criteria for their creation.[26] Like all other states that recognize spendthrift trusts, however, Texas forbids a person to place his own assets in trust and then, by a spendthrift clause or some other restraint, to shield the trust from claims of his current or future creditors.[27] A person is not allowed to make provision for his own support or comfort to the prejudice of his creditors.[28]

■ The mold in which the transaction is cast does not determine who is the settlor of a trust. The person who provides the consideration for a trust is the settlor even if another person or entity nominally creates the trust.[29] Neither Texas courts, nor federal courts that follow Texas law, ought to follow a purely paper trail. We look instead to the reality that lies behind.

■ Dr. Brooks enjoys access to and control over the fund on the same terms as all other beneficiaries: He may determine the manner in which the funds set aside for his benefit will be invested; he may borrow from the trust to buy a house, to educate his children, or to meet any hardship, a term undefined and in the definition of which his fellows on the Plan Committee are apt to be clement; he may terminate his membership in the Association, receive his $645,123.09, and rejoin the Association a week later. A plan that allows beneficiaries access to the fund in all of these ways conflicts with the traditional purposes of spendthrift trusts—to safeguard a non-beneficiary settlor's dominion over his property and to protect the beneficiary against his own improvidence.

In addition to and perhaps more important than Dr. Brooks's general privileges as a beneficiary are his part ownership and control over the 32–member Association named as settlor. Dr. Brooks is one of the 32 who decide each year, directly or through elected representatives, whether the Association should contribute to the fund or pay to the doctors as compensation whatever amount it chooses not to contribute, whether the rules governing access to the fund should stand or be amended, and whether the Association should continue to maintain the trust at all. Collectively, then, the 32 doctors are "the settlor," and they may not, by pooling their earnings and channeling them through a professional association, accomplish what they are forbidden to accomplish individually. They may not set aside part of what they earn, under terms and restraints of their own choosing, and shield such earnings from their creditors.

Both the Bankruptcy Court and the United States District Court concluded that Dr. Brooks had a sufficient part in maintaining and funding of the trust and in controlling

---

**21.** *Id.* at 377 (citing *Brandon v. Robinson,* 18 Ves. 429 (1811)).

**22.** *Id.* § 222, at 385.

**23.** *Id.* at 387.

**24.** *Id.* at 406.

**25.** *Id.* at 407, n. 87.

**26.** Tex.Prop. Code Ann. § 112.035(a), (b), & (c) (Vernon 1984).

**27.** *Id.* § 112.035(d).

**28.** *Goff,* 706 F.2d at 587–88 (citing Texas cases); G. Bogert & G. Bogert, Trusts & Trustees § 223, at 440.

**29.** Restatement (Second) of Trusts § 156 comment *f* (1959).

its assets to consider him a settlor. The deference we usually accord to the decisions of the district courts in matters of state law about which they are likely to be better informed than we [30] lends strength to our own analysis.

Dr. Brooks argues that rejection of his exemption claim portends dire consequences:

1.  no professional or equity owner may be a participant in a retirement plan regardless of the size or nature of the entity that employs the professional, the degree of control exercised by the professional over the retirement plan or the employing entity, and the professional's lack of involvement in the creation or management of the plan;

2.  no equity owner, in any entity, who provides professional services for his livelihood may be a participant in a retirement plan regardless of the size of the entity, regardless of the lack of control that the individual has over the retirement plan or the employing entity, and regardless of the individual's lack of involvement in the creation or management of the plan.

We announce no such dogma. As this court's approach in both *Goff* and the present case demonstrates, we look to specific facts.

For these reasons, we conclude that Dr. Brooks's estate in bankruptcy includes his interest in the ERISA plan and we AFFIRM the judgment of the district court.

---

**30.** *Edwards v. State Farm Ins. Co.,* 833 F.2d 535, 541 (5th Cir.1987); *Jackson v. Johns-Manville Sales Corp.,* 781 F.2d 394, 398 (5th Cir.1986), *cert. denied,* —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986).