In re Jasper John **ALAGNA**, Debtor.

Bankruptcy No. 88–B–12669–A.

United States Bankruptcy Court,
D. Colorado.

Oct. 6, 1989.

---

Ross J. Wabeke, Loveland, Colo., for trustee.

Theodore Z. Gelt, Denver, Colo., for debtor.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER is before the Court on the Trustee's Objection to Debtor's Claim of Exempt Property ("Objection"), Trustee's Amended Objection to Debtor's Claim of Exempt Property ("Amended Objection"), and Debtor's Response to Objection to Claim of Exemption ("Response") filed by Jasper John Alagna ("Debtor"). A hearing on the matter was held before this Court on March 23, 1989.

This case involves the Debtor's four different savings plans, which amount in the aggregate to approximately $473,000.00. The Debtor maintains that the plans' funds are either (1) not property of the bankruptcy estate or, (2) if property of the estate, are wholly or partially exempt pursuant to state or federal law. The funds in which the Debtor claims an interest are a veritable cornucopia of diverse savings, profit sharing, and pension plans. The Trustee maintains each of the various plans is property of the estate, not exempt under state or federal law, and thus available for creditor claims.

## FINDINGS OF FACT

The following findings of fact are taken from stipulated facts, other proposed findings of fact tendered by the parties, and the record before the Court including the transcript of the March 23, 1989 hearing.[1] They are as follows:

1. On September 20, 1988, Debtor filed an individual Voluntary Petition pursuant to Chapter 7 of the Bankruptcy Code. Debtor's wife, Nanciann Alagna, is not a co-debtor and has not otherwise filed for bankruptcy.

2. The Debtor was a principal in J & J Construction Co., Inc. ("J & J"). J & J was a Colorado corporation authorized to do business under the laws of the State of Colorado. It ceased operation and was no longer a going concern as of December 31, 1979.

3. Alagna Construction Company ("ACC"), the successor company to J & J, was a Colorado corporation authorized to do business under the laws of the State of Colorado. The Debtor was also a principal

in ACC, which commenced business in January, 1981. ACC apparently ceased formal operations in 1987, however, it was essentially "inactive," "not operating," and no longer a going concern after 1982–1983.[2] (Transcript, p. 38–39.)

4. On the Debtor's Schedules B–3 and B–4, Debtor identified, verbatim, the following property and claimed it as exempt pursuant to 11 U.S.C. § 522 and applicable state law, C.R.S. § 13–54–104:

Pension for Retirement Benefits:

A. J & J Construction Co., Inc. Pension and Profit Sharing Plan [ ("J & J Profit Sharing Plan") ], Jasper J. Alagna beneficial interest.

B. Alagna Construction company Defined Benefit Pension Plan [ ("ACC Defined Pension Plan") ], Jasper J. Alagna beneficial interest.

C. Alagna Construction Company Money Purchase Pension Plan [or First Restated Pension Trust of Alagna Construction Company ("ACC Pension Trust") ], Jasper J. Alagna beneficial interest.

[ (The three plans may be collectively referred to hereinafter as the "Pension Plans.") ]

D. Jasper J. Alagna Individual Retirement Account [ ("IRA") ].

[ (The three Pension Plans, coupled with the IRA savings plan, may be collectively referred to as "Savings Plans.") ]

5. Most, if not all, contributions to the J & J Profit Sharing Plan were evidently made prior to 1980, although Debtor was unable to produce specific information. Most, if not all, contributions to the ACC Defined Pension Plan and the ACC Pension Trust were made during 1982–1985. Con-

---

1. The findings of fact are supplemented by the pertinent plan instruments including the following exhibits to the Stipulation of Facts jointly filed by the parties ("Joint Stipulation"): Exhibit A, Alagna Construction Company First Restated Defined Pension Plan and amendments thereto; Exhibit B, Alagna Construction Company First Restated Pension Trust and amendments thereto; Exhibit C, J & J Construction Co., Inc. Profit Sharing Plan and amendments thereto; and Exhibit D, Alagna Construction Company stock transfer ledger. Also, pursuant to Court Order, the Debtor supplied additional information de-

noted "Submission of Specific Information" and "Submission of Additional Specific Information Pursuant to Second Order of Court."

2. Debtor's counsel stated that the two businesses "had been inactive, really, since the crash, '82. Prior to that time, they either had a number of employees or a number of independent contractors. They were involved in the construction business and were involved in building homes, I believe." (Transcript p. 38)

sequently, it appears that much, if not most, of the money contributed was paid into the Pension Plans during the termination of or after each respective corporation ceased operation and was no longer a going concern.[3]

6. When the bankruptcy Petition was filed, Debtor was employed in a company identified as owned by his wife. As previously stated, Debtor's wife is not in bankruptcy.[4] Virtually all family assets, including Debtor's residence, are evidently owned by Debtor's wife. Debtor is "nominee and registered owner" of his 1986 Nissan, which is "equitably owned" by his eighteen year-old son, Adam J. Alagna. Other than the Savings Plans, Debtor has virtually no assets in his name.

A. J & J PROFIT SHARING PLAN[5]

7. The Debtor has a beneficial interest in the J & J Profit Sharing Plan in the amount of $105,747.00.[6]

8. The Debtor and his wife each own 50% of the stock of J & J. Together, at all times pertinent, they constituted J & J's only Officers and members of the Board of Directors. The Debtor was President of J & J.[7]

9. J & J established the J & J Profit Sharing Plan July 21, 1978. The purported First Amendment to this Profit Sharing Plan was not signed. The Third and Fourth Amendments were signed by Debtor, alone, as President of J & J and Debtor as Plan Trustee. Debtor's wife did not sign either of these two documents.

10. As of the date of the filing of the Petition in bankruptcy, it appears Debtor and his wife were the exclusive Plan Trustees, Plan Administrators, Investment Managers, and the sole participants and beneficiaries of the J & J Profit Sharing Plan.

11. At all times relevant herein, the J & J Profit Sharing Plan was a qualified plan under ERISA and Section 401 of the Internal Revenue Code.

12. As of September 20, 1988, the Debtor's interest in the J & J Profit Sharing Plan consisted solely of contributions made by J & J and the income earned from the Plan Trustees' investment of such contributions.

13. Pursuant to Section 13.05 of the J & J Profit Sharing Plan, the primary responsibility of the Plan Administrators is to administer the J & J Profit Sharing Plan for the exclusive benefit of the participants and their beneficiaries.

B. ACC DEFINED PENSION PLAN

14. The Debtor has a beneficial interest in the ACC Defined Pension Plan in the amount of $346,298.00.[8] Among other as-

---

3. The ACC Defined Pension Plan received contributions as follows: 1982—$249,896.00; 1983—$64,935.00; 1984—$183,991.00; 1985–1986—$21,883.00. The ACC Pension Trust: 1982—$25,110.00; 1983—$36,380.00; 1984—$20,600.00. No contribution records are evidently available for J & J, but it was evidently in operation only for approximately 17 months.

4. While there was no evidence presented at the time of hearing regarding the history of this Debtor and his assets, the Court gleans from the Statement of Financial Affairs and Schedules that the Debtor holds no assets in his own name and is an employee in his wife's business. The only significant assets the Debtor has are his interests in the four Savings Plans.

5. The Court finds the information thus far supplied by the Debtor as to this Plan and the other Savings Plans and their transactions is not complete, is complex, and is not fully understood at this time. More information and a full accounting will be necessary before the case is closed.

6. *See,* footnote 5, *supra.* The source of funds of this Plan was, in part, a J & J Construction Co. Defined Benefit Plan from which Debtor and Debtor's wife evidently withdrew and transferred, or "rolled over," $65,601.00. "Total participants' equity" in the J & J Construction Co. Defined Benefit Plan as of June 30, 1988 was $185,000.00. Of that equity, approximately $87,000.00 was in notes receivable from Debtor's wife and JANA Ventures, Inc., which notes are evidently delinquent and/or in default.

7. Debtor's accountants report that Debtor owned 100%, not 50%, of the J & J common stock. Debtor's father-in-law and another relative, Anthony Alagna, were in management roles for brief periods.

8. *See,* footnote 5, *supra.* Total contributions to this Plan were $520,609.00. When added to contributions to the ACC Pension Trust, they total $602,699.00. This Plan has loaned approximately $96,000.00 to Debtor and David M. Ickovic and $111,000.00 to JANA Ventures, Inc., most of which is evidently delinquent or in default.

sets, this Plan owns 100% of the common stock of JANA Ventures, Inc.[9]

15. The Debtor and a friend and business partner of the Debtor, David M. Ickovic ("Ickovic"), each owned 50% of the outstanding capital stock of ACC and together they constituted ACC's only Officers and Board of Directors. Ickovic, an accountant, serves as the accountant for Debtor and his wife. Debtor was one of the incorporators and was President of ACC.

16. ACC claims to have established the ACC Defined Pension Plan effective January 1, 1981.[10] At all times relevant to this proceeding, the ACC Defined Pension Plan was a qualified plan under ERISA and Section 401 of the Internal Revenue Code.

17. At all times and as of the date of the filing of the Petition in bankruptcy, Debtor and Ickovic were the Plan Trustees, Plan Administrators, Investment Managers, and the Plan participants and beneficiaries of the ACC Defined Pension Plan.

18. The ACC First Restated Defined Pension Plan was executed on October 29, 1985 by Debtor as President of ACC, and by Debtor and Ickovic as Plan Trustees.

19. The First Amendment to the ACC Defined Pension Plan was executed on August 8, 1986 by Debtor as President of ACC, and by Debtor and Ickovic as Plan Trustees. The Second and Third Amendments were executed on dates unknown, by Debtor only, as President of ACC and as Plan Trustee. Ickovic did not sign either of these amendments.

20. Pursuant to Section 16.06 of the ACC Defined Pension Plan, the primary responsibility of the Plan Administrators is to administer the ACC Defined Pension Plan for the exclusive benefit of the participants and their beneficiaries.

21. As of September 20, 1988, the Debtor's interest in the ACC Defined Pension Plan consisted solely of contributions made by ACC prior to May 8, 1986, and the income earned from the Plan Trustees' investment of such contributions.

## C. ACC PENSION TRUST

22. The Debtor has a beneficial interest in the ACC Pension Trust in the amount of $4,420.00.[11]

23. At all times relevant to this proceeding, the ACC Pension Trust was a qualified plan under ERISA and Section 401 of the Internal Revenue Code.

24. As of the date of the filing of the Petition in bankruptcy, Debtor and Ickovic were the Plan Trustees, the Plan Administrators, and the sole beneficiaries of the ACC Pension Trust.

25. There were three amendments to the ACC Pension Trust. The ACC First Restated Pension Trust agreement and First Amendment were executed on October 29, 1985 and August 8, 1986, respectively, by Debtor as President of ACC and by Debtor and Ickovic as Plan Trustees. The Second and Third Amendments to the ACC Pension Trust were executed on dates unknown, by Debtor alone, as President of ACC and Plan Trustee. Ickovic did not sign either of these amendments.

26. The ACC Pension Trust provides in Section 14.04 that the primary responsibility of the Plan Administrators is to administer the ACC Pension Trust for the exclusive benefit of the participants and their beneficiaries.

---

**9.** The Court has sought from the Debtor complete information regarding JANA Ventures, Inc. Most, but not all the requested information has been submitted. "JANA," evidently an acronym for Jasper and Nanciann Alagna, was incorporated as a Colorado corporation on January 13, 1987 by Gary Smith, an employee of David M. Ickovic & Co., P.C., the accountant for the Debtor. JANA is 100% owned by the ACC Defined Pension Plan. There have been numerous loan transactions between JANA and the three Pension Plans.

**10.** The only evidence before the Court regarding the date for establishing the Plan is a reference to that date in the October 29, 1985 ACC First Restated Pension Trust agreement.

**11.** *See,* footnote 5, *supra.* This value is not consistent with Debtor's subsequent information indicating total ACC Pension Trust "liquid assets" of $7,366.93 and "non-liquid assets" of $31,218.25. This fund did, however, evidently also make an unsecured loan to JANA Ventures, Inc., which is delinquent or in default.

27. As of September 20, 1988, the Debtor's interest in the ACC Pension Trust consisted solely of contributions made by ACC, prior to May 8, 1986, and the income earned from the Plan Trustees' investment of such contributions.

### D. PENSION PLANS, GENERALLY

28. The plan administrators of each of the three respective Pension Plans appear to be the same persons who constitute the shareholders, directors, and officers of the respective employers. Each employer established its plan and each retained final authority over its respective plan including, for example, the power of removing and replacing the plan administrators and designating successor plan administrators.

29. The plan administrators for each of the three Pension Plans are identical to those persons who are the participants and beneficiaries of the three Pension Plans.

30. Numerous loans of substantial sums of money were made by the Pension Plans to their respective administrators, trustees, participants, and beneficiaries, namely, the Debtor and Ickovic in ACC and the Debtor and his wife in J & J. It appears that certain of the loans have substantial remaining balances owing. By way of examples, only, the ACC Defined Pension Plan loaned (a) to Debtor and Ickovic, $96,116.00 ($48,058.00 each), on very favorable terms, and on which loan Debtor was in default on interest payments through 1988–1989, and (b) to JANA Ventures, Inc., a wholly owned subsidiary of the ACC Defined Pension Plan, the sum of $111,000.00 which loan was also, evidently, in default through 1988–1989. The J & J Profit Sharing Plan loaned $2,344.83 to Debtor's wife and $65,000.00 to JANA Ven-

tures, Inc. Both loans are also delinquent and/or in default.[12]

### E. IRA

31. The Debtor established his IRA and holds a beneficial interest in it in the amount of $16,000.00, consisting solely of contributions made by him prior to April 15, 1986. At all times relevant herein, the IRA has been in compliance with Section 408 of the Internal Revenue Code.[13]

### ISSUES

I. Are any of the Savings Plans property of the estate pursuant to 11 U.S.C. § 541(a)(1), or are any of them *not* property of the estate pursuant to 11 U.S.C. § 541(c)(2)?

II. Are creditors' rights and claims in bankruptcy to the funds of the Savings Plans limited by state law, C.R.S. § 38–10–111, and, if so, is the Trustee thus precluded from recovering the funds of the Debtor's Savings Plans?

III. Are the Savings Plans, if determined to be assets of the estate, nonetheless exempt, in whole or in part, pursuant to 11 U.S.C. § 522, other applicable federal law, or applicable state law, C.R.S. § 13–54–104?

### DISCUSSION AND CONCLUSIONS OF LAW

■ Jurisdiction is not in issue. The Court has jurisdiction of the subject matter and the parties to this contested proceeding pursuant to 28 U.S.C. § 1334(b). A claim of, and any objection to, exempt status of property of a debtor's estate is a "core proceeding" as defined by 28 U.S.C. § 157(b)(2)(B) and (E).[14]

---

**12.** The three Pension Plans loaned a total of about $195,000.00 to JANA Ventures, Inc. (J & J—$65,000.00; ACC Defined Pension Plan—$111,000.00; ACC Pension Trust—$24,000.00). All loans are delinquent and/or in default.

**13.** *See,* footnote 5, *supra.* Although not explained, Debtor's Submission of Additional Specific Information Pursuant to Second Order of Court shows only $7,703.93 as the "present value" of his IRA account.

**14.** Jurisdiction and the right to hear and decide this ERISA exemption issue is not vested exclusively in the U.S. District Court because the matter involves an ERISA plan.pursuant to 29 U.S.C. § 1001 *et seq.* While the federal district court has jurisdiction over ERISA pursuant to 29 U.S.C. § 1132(c), ERISA is expressly precluded and cannot be construed "to alter, amend, modify, invalidate, impair or supersede any law of the United States." 29 U.S.C. § 1144(d); *In re Kincaid,* 96 B.R. 1014, 1017 (9th Cir. BAP 1989). This limitation presumably includes the Bank-

I. Are any of the Savings Plans property of the estate pursuant to 11 U.S.C. § 541(a)(1), or are any of them *not* property of the estate pursuant to 11 U.S.C. § 541(c)(2)?

A. *Property of the estate—11 U.S.C. § 541(a).*

11 U.S.C. § 541(a) states in pertinent part:

The commencement of a case under section 301, 302 or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsection (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

The estate created when the Debtor filed his Petition in bankruptcy is broad and encompassing. It embraces all "legal and equitable interests of the debtor ... as of commencement of the case ..." and includes, at least initially, virtually all non-exempt and exempt property. *U.S. v. Whiting Pools,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *In re Matteson,* 58 B.R. 909 (Bankr.D.Colo.1986).

One special exception to the sweeping scope of the definition of property of the estate as contained in 11 U.S.C. § 541(a) is 11 U.S.C. § 541(c)(2) which provides as follows:

(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title.

This section preserves restrictions on the transfer of a beneficial interest of a debtor in a trust which is enforceable under applicable nonbankruptcy law. By preserving the restrictions, the interest in the trust is not included in the property of the estate. Stated simply, trust funds with proper and legally sufficient restraints on transfers and alienation will be excepted from being deemed property of the estate. *Matter of Goff,* 706 F.2d 574, 578 (5th Cir.1983); *In re Kincaid,* 96 B.R. 1014, 1017 (9th Cir. BAP 1989); *In re Dyke,* 99 B.R. 343 (Bankr.S.D.Tex.1989).

■ The substantial majority of courts have concluded that the reference in Section 541(c)(2) to "applicable nonbankruptcy law" means that *only* trusts enforceable under state law as spendthrift trusts are excepted and excluded from the assets of a bankruptcy estate. *Matter of Goff, supra* at 581; *In re Lichstrahl,* 750 F.2d 1488 (11th Cir.1985); *In re Daniel,* 771 F.2d 1352 (9th Cir.1985), *cert.* denied, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313; *In re Graham,* 726 F.2d 1268 (8th Cir.1984); *In re Kincaid, supra; In re Babo,* 97 B.R. 827 (Bankr.W.D.Pa.1989); *In re Toner,* 105 B.R. 978 (Bankr.D.Colo. 1989) *citing In re Matteson, supra.* Anti-transfer and alienation provisions, such as those embodied in ERISA [15] qualified plans, do not automatically and necessarily exclude those plan funds from the bankruptcy estate.[16] Accordingly, only a valid spendthrift trust enforceable under state law is excepted from the bankruptcy estate under Section 541(c)(2).

---

ruptcy Code and its related statutory grants of jurisdiction which confer bankruptcy jurisdiction to the district court which, in turn, has referred the matter to the bankruptcy judges. 28 U.S.C. §§ 157 and 1334.

**15.** Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

**16.** 29 U.S.C. § 1056(d)(1) provides: "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." It has been argued that Section 1056(d) is a separate, independent federal exemption, but not exception to Section 541 assets, which protects pension funds. This position has not

generally been favored in view of legislative history and case law. *Matter of Goff, supra* at 583–85. *See, Mackey v. Lanier Collections Agency & Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); Section III, infra. p. 20. Even those cases which hold that ERISA provides a separate, independent exemption to debtors under 11 U.S.C. § 522(b)(2)(A), acknowledge that the ERISA anti-transfer and anti-alienation languages does *not* except the funds from the estate under Section 541(c)(2). *In re Komet,* 104 B.R. 799 (Bankr.W.D.Tex. 1989).

**B.** *The four Savings Plans do not qualify as spendthrift trusts and are thus not excepted from the estate assets— 11 U.S.C. § 541(c)(2).*

■ In order to determine whether or not these four Savings Plans constitute spendthrift trust funds, an analysis of Colorado law is necessary. *In re Kincaid, supra* at 1017. Spendthrift trusts are valid in Colorado. *In re Matteson, supra* at 911, *citing Brasser v. Hutchison,* 37 Colo.App. 528, 549 P.2d 801 (1976). The *Matteson* court outlined characteristics of a valid spendthrift trust in Colorado as follows:

1. A spendthrift trust is one which by the terms of the trust, restrains the voluntary or involuntary transfer of the beneficiary's interest;

2. A spendthrift trust which names the settlor as beneficiary is invalid; and

3. The operative issue is the extent of dominion and control a beneficiary possesses over the trust corpus.

*In re Matteson, supra* at 911. *See also In re Toner, supra* at 980.

To qualify as a spendthrift trust it is appropriate and necessary that the trust instrument contain articulated spendthrift provisions and the trust be administered in a correct and legally sufficient manner. If the provisions, administration and integrity of a spendthrift trust are disregarded, so too will its status as a special, protected asset of the Debtor.

A brief examination of the Savings Plans is necessary to determine whether they are enforceable as spendthrift trusts under state law and thus excluded from the bankruptcy estate assets. The ACC Defined Pension Plan is, by far, the largest of the four Savings Plans and it is rather representative of the other Savings Plans. The Court will thus, within the context of *Matteson* and state law, analyze the ACC Defined Pension Plan and decide if it and the remaining Savings Plans qualify as spendthrift trusts.

*ACC Defined Pension Plan.* As to the first element of a true spendthrift trust recited in *Matteson,* the element of restraint on transfer, it is uncontroverted that the ACC Defined Pension Plan contains a clear, unqualified anti-alienation and anti-assignment clause in Section 19.02.[17] It is sufficient to meet the requirements of ERISA, 29 U.S.C. § 1056(d)(1), and to qualify for tax exempt status under Section 401(a)(13) of the Internal Revenue Code. It is effective and the first *Matteson* element is satisfied.

With respect to the second element in the *Matteson* test to identify a true spendthrift trust, i.e., a spendthrift trust which names the settlor as beneficiary is invalid, the facts are less clear. Debtor argues that here, the settlor, ACC, is not a named participant or beneficiary, and thus the trust qualifies as spendthrift. This Court disagrees.

A closer examination is warranted considering that ACC is a corporation of which the Debtor is an incorporator, 50% shareholder, a director, and the president. The other 50% shareholder is a friend, business partner, and Debtor's accountant, Ickovic. Debtor is one of two participants and beneficiaries of the Plan. Ickovic is the other.

The Debtor and ACC are, in some measure, not easily distinguished. They are not separate and independent entities, sufficient to satisfy the second test that the settlor and beneficiary not be the same person in order to qualify as a valid spendthrift trust. The connection between and the paramount dominion and control, if not

---

**17.** "19.02. *Spendthrift Clause.* Except as provided in Section 19.11 with respect to Plan loans to Participants, and except with respect to federal income tax withholding, benefits payable under this Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, including any such liability which is for alimony or other payments for the support of a spouse or former spouse or for any other relative of the Employee, prior to actually being received by the person entitled to the benefit under the terms of the Plan; and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge or otherwise dispose of any right to benefits payable hereunder, shall be void. The Trust fund shall not in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any person entitled to benefits hereunder."

dominant control, by the Debtor over the trust, as discussed below, effectively renders the settlor and participant and beneficiary of the subject trust the same person.

The third element of measuring whether a debtor's trust qualifies as a spendthrift, that of dominion and control over the trust, is a crucial if not decisive element.

The ACC Defined Pension Plan was administered by the "Plan Administrator." The Plan Administrators are the Debtor and Ickovic who, together, constitute the administrative committee which "shall act by a majority of its members."[18] The primary responsibility of each Plan Administrator is to administer the plan for the exclusive benefit of the participants and their beneficiaries.[19] The participants in the Plan and their beneficiaries are the Debtor, Ickovic and their families.

One or both of the Plan Administrators may resign at any time or may be removed by the employer with or without cause.[20] The employer, ACC, acting through its President the Debtor, designates any successor Plan Administrators.

All Plan policies and interpretations by the Plan Administrators are deemed final and conclusive.[21] Among the myriad responsibilities, the Plan Administrator is responsible to authorize and direct the Trustee with respect to all disbursements from the trust.[22] The Plan Administrator is responsible for directing and advising the Trustee with respect to investments and income and other matters concerning the trust corpus.[23]

All funds contributed to the trust inure to the benefit, exclusively, of the Plan participants and their beneficiaries and may never revert to or be used or enjoyed by the employer.[24] The Trustees of the ACC Defined Pension Plan are the Debtor and Ickovic. The Trustees may resign or may be removed by the employer with or without cause and their replacements are to be designated by the employer.[25] The Trustees are given a broad range of significant power and authority over the trust fund, subject to the Plan Administrators and the appointment of an Investment Manager, if any, which can be appointed by the Plan Administrators.[26]

The ACC Defined Pension Plan provides that loans may be made to a participant if the participant is "credit-worthy."[27] The ACC Defined Pension Plan provides for distributions to participants or their beneficiaries in the event of death, disability, normal retirement, termination of employment, or termination of the ACC Defined Benefit Pension Plan.[28]

The Plan provides that the employer reserves the right to alter, amend or terminate the Plan agreement.[29] The Debtor, as President of the employer and as the Plan Trustee, twice acted alone and amended the ACC Defined Pension Plan.

It is clear and straightforward: The employer controls the contributions, Plan, Plan Administrator, and Plan Trustee, and the employer is effectively controlled by the Debtor. The Debtor was the employer's (a) President, (b) Director, and (c) Chief

---

18. *See,* ¶ 16.01 and ¶ 16.09.

19. *See,* ¶ 16.06.

20. *See,* ¶ 16.02.

21. *See,* ¶ 16.06.

22. *See,* ¶ 16.06.

23. *See,* ¶ 16.06.

24. *See,* ¶ 15.01 and ¶ 1.02.

25. *See,* ¶ 15.02.

26. *See,* ¶ 15.02(g).

27. *See,* Findings of Fact, *supra,* ¶ 30, footnotes 5, 6, 8, 9, and 11. The ACC Defined Pension Plan and the ACC Pension Trust made loans of about $231,000.00 to Debtor, Ickovic and JANA Ventures, Inc., virtually all of which are still outstanding and delinquent or in default. The three Pension Plans made eight loans totalling approximately $357,000.00 to those three borrowers, plus Nanciann Alagna, most of which are also outstanding and delinquent or in default.

28. *See,* ¶ 8.03, ¶ 7.04, ¶ 7.01, ¶ 9.03, and ¶ 10.01, respectively.

29. *See,* ¶ 18.01.

Executive Officer. He acted, at times, in concert with Ickovic but significantly he also acted, at times, alone and without formality. The Debtor was and always appears to have been the central, operating, dominant figure with regard to the employer and the Plan.

When the Debtor acted the employer and Plan administration appear to have worked in conformity with his acts. The facts and history indicate the employer and the Pension Plans were primarily operated by the Debtor and for the Debtor. This was true as a formal matter, it was certainly true as a practical matter.

It is fair and accurate to conclude that the Debtor held and holds today, paramount, if not dominant, control over the ACC Plan and its assets. Debtor is a Plan Administrator, Plan Trustee, Plan Investment Manager, Plan participant and beneficiary, and the person in control (as president, director and 50% shareholder) of the employer. He holds, and significantly has exercised alone and exclusively, control over the Plan and its assets.

To conclude that Debtor did not have dominion and control over the ACC Defined Benefit Pension Plan is to ignore the facts, the Plan provisions, and actual administration of the Plan and its funds. To conclude that the Plan funds are spendthrift trust funds under state law and thus *excepted* as an asset of the estate is simply legally incorrect and, not incidentally, contrary to the purpose and policy of the Bankruptcy Code.[30]

*The IRA.* The IRA also contains spendthrift provisions, prohibiting voluntary and involuntary transfer of benefits payable under the IRA. It was established and has been maintained in compliance with Section 408 of the Internal Revenue Code. In this instance, however, there is no dispute that the Debtor established the IRA, manages and controls the IRA, exclusively, and is the beneficiary thereof.

C. *F.D.I.C. v. Farha, (10th Cir. June 13, 1989) is not controlling and dispositive of the issue whether or not ERISA qualified Plans are excepted from*

---

**30.** *ACC Pension Trust.* As in the ACC Defined Pension Plan, the ACC Pension Trust also contains the anti-alienation, anti-assignment clause language. This language is necessary to meet the requirements of ERISA and to qualify for tax-exempt status under Section 401(a)(13) of the Internal Revenue Code. The ACC Pension Trust contains provisions similar to the ACC Defined Pension Plan regarding the plan administrator, administrative committee where there is more than one administrator, the trustees, and beneficiaries. The Debtor and Ickovic are the Plan Administrators, Plan Trustees, they control the employer and they are evidently the only participants of this trust.

The Trust also provides for distributions to the participants or their beneficiaries upon termination of the ACC Pension Trust which can, as with the ACC Defined Pension Plan, be determined in the discretion of the employer. The trustee may make loans to a participant in his discretion in accordance with the limitations set out in the trust agreement. Finally, the Plan Trustee, under the advice of the Plan Administrator, determines the investments and management of the trust funds.

As with the ACC Defined Pension Plan, the Debtor executed amendments to the ACC Pension Trust as President of the employer, ACC, and as Plan Trustee. The Debtor demonstrated, again, that he was willing and able to act alone

with regard to and control the plan. Ickovic did not sign or authorize either of the undated Second or Third Amendments. In light of these facts, the Court must conclude that the Debtor exercised primary, if not dominant, control over the ACC Pension Trust, as well, not only as to its establishment, but as to the management, use, distribution or termination of the trust.

*The J & J Profit Sharing Plan.* J & J was the predecessor corporation to ACC. The Debtor owns 50% of the shares of J & J and his wife, Nanciann Alagna, owns the other 50%. J & J effectively stopped operating in 1980. All contributions relative to Debtor's beneficial interest in the J & J Profit Sharing Plan were evidently made by J & J prior to 1981, but during or after the business shut down. With respect to the analysis of whether this is an enforceable spendthrift trust, the Debtor asserts the same argument as it did for the ACC Defined Pension Plan and Pension Trust. Specifically, that J & J, an entity distinct from the Debtor, established the trust and that the Debtor does not exercise control over the trust. The Court again disagrees. The J & J agreement is very similar to those of the ACC Plans in terms of structure, authority, administration and legal effect. Not only does the Debtor have control, he has exercised exclusive control, without regard to the only other shareholder, Plan Administrator, and Trustee, his wife.

*Debtors' bankruptcy estate.*[31]

Debtor maintains that the issue of whether or not a self-settled spendthrift trust is excluded from a bankruptcy estate is controlled and entirely decided by the recent Tenth Circuit Court of Appeals decision in *F.D.I.C. v. Farha, supra.* This Court certainly agrees with the Debtor that *F.D.I.C. v. Farha* holds that all ERISA qualified pension plan funds, including those in self-settled spendthrift trusts, are free, are *exempt,* from *commercial garnishment* under state law.

This Court does not, however, agree with the Debtor that the decision, rationale or law recited in *Farha* is controlling and dispositive of the issues in this, a *bankruptcy case.* This Court does not agree, as argued by Debtor, that *Farha* holds a self-settled spendthrift trust is to be excepted from and not included as property of a bankruptcy estate, pursuant to Section 541(c)(2). For one thing, Debtor's argument that his Savings Plans "are not property of the estate ..." as a result of the *Farha* decision is simply misplaced. *F.D.I.C. v. Farha* distinguishes between "excepted" and "exemption," and holds that a qualified plan fund is *exempt,* not *excepted,* from commercial garnishment.

The Tenth Circuit Court of Appeals concluded that:

ERISA section 206(d)(1), as well as the structure and purpose of the statute as a whole, compel the conclusion that ERISA pension plan benefits are to be free from *commercial garnishment,* even if the plan constitutes a self-settled trust subject to garnishment under state law. (Emphasis added.) *Id.* at 13.

Debtor reasons that (1) since *Farha* holds all ERISA qualified plans cannot be subject to commercial garnishment under state law, and (2) the *Farha* pension plan was under the direct dominion and control of the debtor, Mr. Farha, to an even greater degree than are the Savings Plans under the control and dominion of Mr. Alagna, that these Savings Plans are absolutely insulated from the Trustee's claims.

*Farha* can be distinguished and thus is not controlling for the following reasons. First and most significantly, *Farha* was not set in a bankruptcy context. This case is. The appellate court expressly recognized that the Bankruptcy Code and a bankruptcy case may render inapplicable the general rule of *Farha* that ERISA comprehensively protects all qualified plans and preempts all state law which might otherwise permit garnishment of self-settled pension plans.[32]

Second, the *Farha* opinion and decision appear to be directed at, and applied only to, "commercial creditors" and "commercial garnishment." This language and the distinction made are not accidental and not without importance.[33]

**31.** *F.D.I.C. v. Farha,* (10th Cir. June 13, 1989) was withdrawn by the Tenth Circuit Court of Appeals after issuance of this opinion. Since this Court believes that *F.D.I.C. v. Farha* is not dispositive or controlling in this case, withdrawal of the opinion by the Tenth Circuit is not of consequence to this opinion.

**32.** "The FDIC cites a number of federal bankruptcy cases for the proposition that state laws on self-settled spendthrift trusts expose plans such as Farha's to garnishment. *See Brooks v. Interfirst Bank (In re Brooks),* 844 F.2d 258 (5th Cir.1988); *Goff v. Taylor (In re Goff),* 706 F.2d 574 (5th Cir.1983). As we have noted, the general preemption provision of ERISA specifically states that ERISA should not be interpreted as preempting other federal laws. 29 U.S.C. § 1144(d). The bankruptcy code provides that any property in which a debtor has 'legal or equitable interests' at the time of bankruptcy is to become part of the bankruptcy estate. 11

U.S.C. § 541(a)(1). This is so notwithstanding 'any provision in an agreement ...that restricts or conditions transfer of such interest by the debtor.' *Id.* § 541(c)(1)(A). Reading the bankruptcy provisions together with section 1044(d), the court in *Goff* reasoned that the general rule sweeping all property into the bankruptcy estate preempts ERISA's anti-alienation clause. *Goff,* 706 F.2d at 586–87. However, these cases shed little light on the effect of the ERISA anti-alienation provision outside the bankruptcy context." *F.D.I.C. v. Farha, supra* at 9–10, fn. 5 (as yet unpublished opinion).

**33.** "The first issue we address is whether these two provisions combine to protect an employee's interest in a pension plan from garnishment by his commercial creditors." *F.D.I.C. v. Farha, supra* at 2 (as yet unpublished opinion). "[W]e believe it bolsters our holding that 206(d)(1) protects participants' interests in qualified pension plans from commercial creditors." *Id.*

Third, ERISA is not, in all circumstances and at all times, the only controlling law with respect to pension plans. It was not intended to be so and it has not been applied in that manner.

We do not hold here that benefits are not subject to levy by creditors authorized by other federal statutes to garnish ERISA plan benefits. *See* infra. n. 4. We hold only that commercial judgment creditors of a pension plan participant may not garnish that participant's interest in the plan pursuant to state law. *Farha, supra* at 7, fn. 2.[34]

Moreover, ERISA is generally preempted by other inconsistent or contrary federal law:

The FDIC also correctly points out that ERISA is generally preempted by contrary *federal* law. *See* 29 U.S.C. § 1144(d) ('Nothing in [ERISA] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States [except pre-existing federal pension law] or any rule or regulation issued under any such law.') *F.D.I.C. v. Farha, supra* at 7, fn. 3.[35]

This Court views the Debtor's interpretation and application of ERISA to this bankruptcy situation as one which attempts to alter, invalidate or impair, and supersede, important provisions of, as well as the spirit and intent of, the Bankruptcy Code.

Fourth, the three statutory goals of ERISA cited by the Appeals Court in *Farha* must be measured against and balanced with the statutory goals of the Bankruptcy Code.[36]

A paramount goal is to give a debtor a fresh start by discharging most, if not all, debt, and concurrently distributing to creditors a full pro rata portion of debtor's available assets. Part of that goal is to allow a debtor sufficient assets for maintenance of the debtor and his/her dependents. A debtor is entitled to a fresh start with dignity, but not a head start with impunity. The extraordinary equitable relief of a discharge of debt is to be balanced with fair treatment of creditors. Allowing this Debtor to retain almost one-half million dollars in self-settled, self-controlled pension funds after discharging all his debts in bankruptcy, with absolutely no payment to the creditors, does not fit well or easily into the paramount goal of bankruptcy law.

Fifth, *F.D.I.C. v. Farha* indeed upholds as an exempt and protected asset from commercial creditors, a self-settled trust that is perhaps not otherwise enforceable under state law. *Farha* does not, however, uphold and protect a self-settled trust or

The Appeals Court at six places in its decision refers specifically and explicitly to "commercial creditors" and "commercial garnishment." The court chose its words carefully.

**34.** "This does not mean that plan assets are always free from judicial process. Pension plans themselves conduct a wide variety of activities, and may be sued in a number of roles. *See, generally, Mackey v. Lanier Collections Agency & Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 2186–87, 100 L.Ed.2d 836 (1988). In addition, an individual's benefits are subject to garnishment under certain limited circumstances. For example, this Circuit has held that a participant-trustee's plan benefits may be garnished to satisfy a judgment remedying his embezzlement of plan funds while a trustee. *See, Guidry v. Sheet Metal Workers Nat. Pension Fund,* 856 F.2d 1457, 1459–60 (10th Cir.1988) [*cert.* granted, —— U.S. ——, 109 S.Ct. 3212, 106 L.Ed.2d 563 (1989) ]. Plan benefits may also be garnished pursuant to 'qualified domestic relations orders,' 29 U.S.C. § 1056(d)(3) (Supp.1984). We do not hold here that benefits are not subject to

levy by creditors authorized by other federal statutes to garnish ERISA plan benefits. *See* infra. n. 4. We hold only that commercial judgment creditors of a pension plan participant may not garnish that participant's interest in the plan pursuant to state law." *F.D.I.C. v. Farha, supra* at 7–8, fn. 2.

**35.** *See,* footnotes 2, 3, and 4 at p. 7 of *F.D.I.C. v. Farha* for identification of various exceptions and limitations on the application of ERISA to pension plans. "Accordingly, courts have held that ERISA should not be construed so as to preempt other federal laws. *See, e.g., In re Bastian,* 45 B.R. 717, 718 (Bankr.W.D.N.Y.1985) and cases cited therein." *In re Kincaid, supra* at 1017.

**36.** This Court is convinced that, in its most simple and basic form, the central issue which must be decided is whether the Bankruptcy Code or ERISA shall prevail with respect to pension plans in bankruptcy cases. The ultimate decision of course rests with Congress.

pension fund which (1) has *not* had its provisions, administration, and integrity respected and maintained by the person who served as the fund's administrator, trustee, participant, and beneficiary, and (2) was funded and maintained primarily after the employer, the business funding the plan, essentially ceased operations as a going concern. Moreover, this set of Savings Plans, in good measure, appear to have served as personal savings/lending funds as well as an investment vehicle for the Alagna's, particularly through JANA Ventures, Inc. The *Farha* pension fund and the Pension Plans in the within case, appear quite different as to their genesis, purpose, management, administration, and amendments.

This Court concludes that the recent Tenth Circuit *F.D.I.C. v. Farha* decision (1) does not, as Debtor argues, *except* from a debtor's bankruptcy estate self-settled ERISA qualified pension plans and, (2) as federal law, does not *exempt* such plan funds from a bankruptcy estate and the bankruptcy trustee.

### D. Conclusion regarding enforceability as spendthrift trusts.

This Court concludes in light of *In re Matteson, In re Toner*, and the Colorado cases cited by each of those courts, that the ACC Defined Pension Plan, the ACC Pension Trust, the J & J Profit Sharing Plan, and the IRA are *not* spendthrift trusts enforceable under the law of Colorado. There is no "bright-line" test for making that determination and it is possibly not wise to try and find one. It is probably impossible to do so. Rather, all the indicia of ownership, authority, control, administration, and benefit, must be taken together and measured to determine whether or not the trust can be legitimately and fairly deemed a spendthrift trust under state law. Having done so, this Court finds that the Debtor here *held and exercised* dominant control over the funding and administration of the Savings Plans of which he was primary participant and beneficiary. For that reason, the Savings Plans are not enforceable as spendthrift trusts under state law. They are property of the estate.

II. Are creditors' rights and claims in bankruptcy to the funds of the Savings Plans limited by state law, C.R.S. § 38–10–111, and, if so, is the Trustee thus precluded from recovering the funds of the Debtor's Savings Plans?

The Debtor argues that state law governing trusts wherein the settlor and beneficiary are the same person, C.R.S. § 38–10–111, is dispositive of the rights of the bankruptcy Trustee in this case. The consequence of that proposition, under this Debtor's history and facts, is that the Trustee here may have no right to challenge or object to the exemption claim or recover for the estate, assets and Plan funds in which the Debtor may have a right or interest. (*See,* transcript p. 32.)

C.R.S. § 38–10–111 states:

All deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods, chattels, or things in action, or real property, made in trust for the use of the person making the same *shall be void as against the creditors existing* of such person. (Emphasis added.)

Debtor contends "if the corporation and Debtor are one and the same ..." then C.R.S. § 38–10–111 is dispositive because (1) "it is the statute that relates to the creditors' ability to attack the spendthrift trust [and] it only applies to [then] existing creditors" and (2) the creditors of this estate were not creditors at the time the Savings Plans were established. (*See,* transcript p. 33.)

This Court rejects the argument.

First, C.R.S. § 38–10–111 is one of several Colorado statutes which concern the avoidance of fraudulent conveyances and recovery of transferred property. This statute specifically focuses on the use of self-settled trusts in that context. This statute, essentially, obviates the need to prove intent to defraud and is limited to then existing creditors. In a sense, it creates a presumption of fraud. *See, Fulton Co. v. Smith,* 27 Colo.App. 279, 284, 149 P. 444 (1915), *aff'd.,* 64 Colo. 33, 170 P. 1183 (1918); *Wilson v. American Nat'l. Bank,* 7 Colo.App. 194, 42 P. 1037 (1895).

Another principal state statute regarding fraudulent conveyances, which is applicable to all creditors, creates a conclusive presumption of fraud and voids such conveyances as against creditors. C.R.S. § 38–10–114. A third state statute, intended to void all transfers made with the intent to hinder, delay or defraud creditors, requires a showing of actual intent and applies to all creditors, generally, not just existing creditors. C.R.S. § 38–10–117; *See, Fish v. East,* 114 F.2d 177 (10th Cir. 1940). These state statutes are primarily directed to presumptions, burdens of proof, and elements of avoidance of transfers. They are not controlling and dispositive of federal bankruptcy exemption questions.

■ Secondly, this is *not* a fraudulent conveyance action to recover transferred property under 11 U.S.C. §§ 544, 548 or otherwise. The Debtor's beneficial interests in and rights to the Savings Plans are property of the estate. This action is an objection to Debtor's claim of exemption in property of the estate. Exemptions are defined and determined as of the date Debtor filed his Petition in bankruptcy. *In re Kincaid, supra* at 1020. Exemptions are also fundamentally a function of the Bankruptcy Code albeit a function which depends, in part, on state law. *Hanover Nat'l. Bank v. Moyses,* 186 U.S. 181 at 189, 22 S.Ct. 857 at 861, 46 L.Ed. 1113 (1902). While the actual allowable exemptions may, in large measure, be decided by the state law, in bankruptcy cases exemption issues and the trustees' and creditors' powers, claims, rights, and title to property are determined by federal, not state, fraud law.

Third, the Tenth Circuit Court of Appeals has recently delineated, to some degree, how and when it will allow or disallow exemptions which might be the product of fraud. *In re Mueller,* 867 F.2d 568 (10th Cir.1989). This Bankruptcy Court discerns no limitations in *Mueller,* or in any other Code provisions or bankruptcy case law for that matter, similar to those in C.R.S. § 38–10–111 so that such a limitation might apply in this case. Indeed, arguably, *Mueller* might apply in the instant case, but the parties have not presented facts, argued or briefed that issue at this time.

III. Are the Savings Plans, if determined to be assets of the estate, nonetheless exempt, in whole or in part, pursuant to 11 U.S.C. § 522, other applicable federal law, or applicable state law, C.R.S. § 13–54–104?

A. *Applicability of 11 U.S.C. § 522(b)(2)(A) exemption.*

■ Section 522 sets forth provisions for bankruptcy exemptions. It permits a debtor to elect the federal exemptions set out in Section 522(d) unless preempted by state law. 11 U.S.C. § 522(b)(1). Alternatively, the debtor can elect to exempt property under state law, *plus* "any property that is exempt *under Federal law* other than subsection (d) of this Section ... that is applicable on the date of the filing...." (Emphasis added.) 11 U.S.C. § 522(b)(2)(A). Colorado has elected to implement its own exemptions found principally in C.R.S. §§ 13–54–102 and 13–54–104.

With respect to the Debtor claiming an exemption on his four Savings Plans, two threshold questions must be answered. First, is ERISA the "[f]ederal law, other than subsection (d) ..." contemplated in Section 522(b)(2) so that ERISA itself provides a separate, independent federal exemption to the Debtor? More simply, does ERISA itself provide a federal exemption of qualified plans to bankruptcy debtors? Second, what exemption, if any, and in what amount, does state law give to this Debtor?

I conclude that, first, ERISA does *not* provide a separate, independent federal exemption of qualified plans to bankruptcy debtors and, second, state law accords a limited exemption of qualified plans to bankruptcy debtors.

First, this Court has carefully examined the extensive case law on the issue as to whether ERISA provides an independent federal exemption to bankruptcy debtors under Section 522(b)(2). The issue is complex, subject to seemingly inconsistent federal law, tangled by different legal theories, and victimized by lack of precise drafting and direction by Congress. Out of this disarray, however, several conclusions can be drawn.

1. Most courts, particularly those circuit courts which have directly addressed the issue, approve and adopt the conclusion that ERISA does *not* provide a separate, independent federal exemption to bankruptcy debtors for pension and retirement plans. *In re Lichstral, supra* at 1491; *In re Daniel, supra* at 1361; *In re Graham, supra* at 1274; *Matter of Goff, supra* at 580; *In re Dyke, supra* at 343; *In re Toner, supra* at 980.

2. Congress prepared a list and identified those "other" federal laws which it clearly contemplated would establish federal exemptions available to bankruptcy debtors, in addition to state exemptions, under Section 522(b)(2). ERISA was not on that list. *Matter of Goff, supra* at 583; *In re Toner, supra* at 981.[37]

3. There is a significant, rational, and demonstrated difference between the federal exemptions accorded certain funds identified by Congress under Section 522(b)(2)(A) and ERISA pension plans. *Matter of Goff, supra* at 583–86; *In re Daniel, supra* at 1361; *In re Dyke, supra* at 346; *In re Toner, supra* at 983.[38]

4. Congress, not the Bankruptcy Court, is capable of and responsible for setting policy and then crafting clear legislation accurately reflecting that policy.

As quoted and well discussed at length in *Matter of Goff* and *In re Toner*, the legislative history itemizes certain federal laws which Congress considered in enacting this section.[39] ERISA is not specifically mentioned among those. The courts which have addressed this issue have concluded that the legislative intent is clear. ERISA is not and was not intended to be an additional avenue in bankruptcy by which a debtor may exempt assets from a bankruptcy estate.

In the face of these unassailable conclusions, I find it impossible to declare that ERISA is, indeed, "other" federal law which grants to bankruptcy debtors a separate and independent exemption under the Bankruptcy Code. Indeed, I can only declare that, at least until Congress states otherwise, ERISA is not an available federal exemption under Section 522(b)(2) and this Debtor is, with regard to his Pension Plans as well as his IRA, entitled only to his applicable state exemptions.

B. *Applicability and extent of exemption under state law, C.R.S. § 13–54–104.*

(1) *Is applicable state law specifically designed to exempt, in bankruptcy, pension plans (C.R.S. § 13–54–104(1.1) preempted by ERISA?*

 State exemptions as to earnings and income are principally governed by Section

---

**37.** "Foreign Service Retirement and Disability payments, 22 U.S.C. 1104; Social Security payments, 42 U.S.C. 407; Injury or death compensation payments from war risk hazards, 42 U.S.C. 1717; Wages of fishermen, seamen, and apprentices, 46 U.S.C. 601; Civil service retirement benefits, 5 U.S.C. 729, 2265; Longshoremen's and Harbor Workers' Compensation Act death and disability benefits, 33 U.S.C. 916; Railroad Retirement Act annuities and pensions, 45 U.S.C. 228(L); Veterans benefits, 45 U.S.C. 352(E); Special pensions paid to winners of the Congressional Medal of Honor, 38 U.S.C. 3101; and Federal homestead lands on debts contracted before issuance of the patent, 43 U.S.C. 175." *Matter of Goff, supra* at 583.

**38.** "Furthermore, excluding ERISA-qualified pension plans from the list of property exempted under federal law is consistent with an important distinction between exempted property

and property covered by ERISA. Despite the similarity between the anti-alienation provisions of ERISA and some of the listed statutes, the 'pensions, wages, benefits and payments included in the ... list are all peculiarly federal in nature, created by federal law or related to industries traditionally protected by the federal government. In sharp contrast, ERISA regulates private employer pension systems.' *In re Graham,* 726 F.2d at 1274. It is this 'peculiarly federal nature' shared by the cited statutes that identifies and determines which federal statutes are to be included within the 'other federal law' exemption of § 522 and which, like ERISA, are to be excluded. *See, Matter of Goff,* 706 F.2d at 586. The failure to mention ERISA in the legislative history accompanying § 522(b)(2)(A) is, therefore, both purposeful and reasoned. [Footnote omitted]" *In re Daniel, supra* at 1361.

**39.** *Matter of Goff, supra* at 581; *In re Toner, supra* at 982–83.

104 of Article 54. It was recently amended to define and provide, specifically and explicitly, exempt status for pension plans in bankruptcy cases. C.R.S. § 13–54–104(1.1) reads as follows:

> For purposes of this section and *only for the purpose of claiming an exemption in bankruptcy, 'avails* of any pension or retirement benefits or deferred compensation plan' means profits or proceeds in any pension or retirement plan or deferred compensation plan, including those in which the debtor has received benefits or payments or has the present right to receive benefits or payments in the future and *including pensions or plans which qualify under the federal 'Employee Retirement Income Security Act of 1974'* as an employee pension benefit plan, as defined in 29 U.S.C. § 1002, avails of any individual retirement account, as defined in 26 U.S.C. § 408, and avails of any KEOGH plan, as defined in 26 U.S.C. § 401. (Emphasis added.)

Two cases appear controlling on the question to what extent the Debtor is entitled to a state exemption on these Pension Plans and IRA: *Mackey v. Lanier Collections Agency and Service, Inc., supra; In re Toner, supra.*

The United States Supreme Court in *Mackey v. Lanier Collections Agency and Service, Inc., supra,* held that a Georgia garnishment statute which singled out ERISA welfare plan benefits was preempted by ERISA in accordance with Section 514(a) of ERISA. Section 514(a) provides that ERISA preempts "any and all state laws insofar as they may now or hereafter relate to any employee benefit plan covered by the statute." 29 U.S.C. § 1144(a).

In *Mackey,* the petitioners were the trustees of an employee benefit plan that provided vacation and holiday benefits to eligible employees in several southwestern states. The respondent, an original plaintiff who sought to garnish the petitioners, was a collection agency. The Georgia statute at issue essentially tracked the language of ERISA. It barred garnishments of funds or benefits of an employee benefit plan or program subject to ERISA unless the garnishment was based on a judgment for alimony or for child support. Ga.Code Ann., § 18–4–22.1 (1982).

The Supreme Court held that "the Ga. Code Ann., § 18–4–22.1, which singled out ERISA employee welfare benefit plans for different treatment under the state garnishment procedures, is preempted under Section 514(a). The state's express reference to ERISA plans suffices to bring it within those federal laws' preemptive reach." *Mackey, supra,* 108 S.Ct. at 2185.

The *Mackey* court, in dicta, noted that the Georgia legislature intent was consistent with ERISA's underlying purpose, but remarked that the good intention was not enough to save the state law from preemption. "The preemption provision [of Section 514(a)] ... displaces all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements." *Id. citing The Metropolitan Life Insurance Company v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985).

In light of the express language of preemption in ERISA and *Mackey's* broad holding that the "express reference to ERISA plans suffices to bring it within the federal laws' preemptive reach" this Court must evaluate the amended Colorado exemption statute in that light.

Section 13–54–104(1.1) was effective July 1, 1988. Prior to that time Section 13–54–104, the Colorado statute which restricts garnishment of and levy on a debtor's earnings, defined earnings to include the *"avails"* of any pension or retirement benefits and deferred compensation plan.[40] Because an IRA was not a plan as such, it was unclear as to whether the language was intended to include an IRA. Moreover, other courts which had considered IRA's in connection with earnings exemption statutes, held that an IRA was not

---

**40.** For a rather elaborate and useful discussion of the term "avails" and one which this Court generally adopts, *see, In re Toner, supra;* Schlos- ser, *Exempting Retirement Benefits for Bankruptcy in Colorado,* January, 1989, *Colorado Lawyer,* p. 17–18.

exempt. *See,* Schlosser, *Exempting Retirement Benefits for Bankruptcy in Colorado,* January, 1989, *Colorado Lawyer,* at 18.

Section 13–54–104(1.1) was enacted, in part, to clarify these questions. It also provided for this exemption in bankruptcy. At the same time, the Colorado legislature added the specific reference to ERISA.

The Explanation of Amendment attached to the House Bill provides insight into the Colorado legislature's intent. The explanation states: "The purpose of the bill was to allow a debtor in bankruptcy to claim an exemption for ERISA plans, IRA accounts, KEOGH plans, and any kind of pension or plan in which the debtor has received payments or has a present or future right to receive payments." This statutory design appears to be consistent with the anti-alienation provisions set out in ERISA and this Court believes the design and the language referencing ERISA is fatal to its being enforceable.

Three other courts have considered this issue and reached the same conclusion. *In re Dyke, supra; In re Hirsch,* 98 B.R. 1 (Bankr.D.Ariz.1988), *aff'd., In re Seigel,* 105 B.R. 556 (D.Ariz.1989); *In re Komet, supra.* In each case, the bankruptcy court held that the respective state exemption statute was preempted by ERISA. In *Komet,* the court observed that the Texas statute expressly exempted all government or church plans if they qualified under *ERISA. Id.* at 805. Again the reference alone was enough to cause its preemption.

The amendment to the Colorado statute, subsection 1.1 of Section 104, contains specific references to and is explicitly directed at ERISA. It is thus preempted by ERISA *"insofar as it may now or hereafter re-*late to any employee benefit plan covered by the statute" (emphasis added), 29 U.S.C. § 1441(a), i.e., only as to its reference to ERISA. This language gives guidance as to the extent to which the state statute is preempted. It is not preempted in its entirety such as to IRA's. It is, however, preempted as to ERISA qualified "pensions or plans." [41]

In *In re Toner, supra,* the court concluded with respect to Section 13–54–104, that the statutory language "avails of any pension or retirement benefits or deferred compensation plan" meant that only interest or income accruing on the pension and profit sharing plans "was, in part, exempt from creditor claims." In a reasoned opinion which, not incidentally, results in a fair and equitable apportionment of pension funds between the debtor and creditors, the court ruled that state law, C.R.S. § 13–54–104, exempts 75% of the "interest or income accruing on the pension and profit sharing plans," but not of the "corpus" of the plans. This Court adopts the opinion, reasoning, and conclusion of the *Toner* court.

The Debtor here is entitled to a state exemption of 75% of the interest, or income, accrued and accruing on the corpus of each of the Pension Plans and the IRA. The balance of the funds, those constituting the corpus of the Plans, are not exempt funds and are a non-exempt asset of the bankruptcy estate.[42]

## ORDER

Accordingly, for the reasons set forth above,

---

**41.** It is possible that the ERISA preemption provision could be construed still broader to trigger preemption of the entire Colorado statute "relating to" exemptions of pension plans in Colorado, i.e., all of Section 104 of Article 54, Title 13. Certain courts have invoked a broad and comprehensive application of ERISA preemption, and have done so in other states' pension fund statutes. *In re Dyke, supra* at 346. Such a sweeping and preclusive interpretation, I believe, is not warranted.

**42.** For different reasons, an accountant or perhaps an examiner, should be employed by the Trustee in this case. The long and complicated financial history of the Savings Plans, coupled with the inconsistent and confusing information as to contributions, loans, withdrawals, investments, and current balances, warrant a careful and complete examination. The further need to delineate "corpus" versus "avails," or interest and proceeds, is one requiring time and expertise only an accountant or similar skilled examiner could provide.

318

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment is entered on behalf of the Trustee, and it is

ORDERED as follows:

1. Debtor's four Savings Plans are assets of the Debtor's estate pursuant to 11 U.S.C. § 541(a). They are not excepted from the estate pursuant to Section 541(c)(2).

2. Debtor's three Pension Plans are not exempt property pursuant to 11 U.S.C. § 522(b)(2)(A).

3. The Trustee's rights in bankruptcy are not limited and controlled by C.R.S. § 38-10-111.

4. Debtor is entitled to exempt from the bankruptcy estate only 75% of the "avails," the interest and income earned on, and not the corpus of, the Savings Plans pursuant to C.R.S. § 13-54-104.